In re CARDIZEM CD ANTITRUST
LITIGATION.

Nos. 99–73259, 99–73870.
Master File No. 99–MD–1278.
MDL No. 1278.

United States District Court,
E.D. Michigan,
Southern Division.

March 14, 2001.

299

Bruce E. Gerstein, Garwin, Bronzaft, Gerstein & Fisher, LLP, New York City, Stephen Lowey, Lowey, Dannenberg, Bemporad & Selinger, PC, White Plains, NY, Elwood S. Simon, Michael G. Wassmann, Lance C. Young, Elwood S. Simon & Assocs., Birming-

ham, MI, Joseph J. Tabacco, Berman, DeValerio, Pease & Tabacco, San Francisco, CA, Richard B. Drubel, Boies & Schiller, Hanover, NH, for plaintiffs.

Joe Rebein, Shook, Hardy & Bacon LLP, Kansas City, MO, Dykema Gossett, Bloomfield Hills, MI, Norman C. Ankers, Honigman, Miller, Schwartz & Cohen, Bingham Farms, MI, Colin A. Underwood, Louis M. Solomon, Hal S. Shaftel, Michael S. Lazaroff, Solomon, Zauderer, Ellenhern, Frischer & Sharp, New York City, Michael D. Hausfeld, Cohen, Milstein, Washington, DC, Andrew J. McGuinness, Ann Arbor, MI, Craig L. John, Dykema Gossett PLLC, Kimberly A. Bickersteth, Bloomfield Hills, MI, Elizabeth J. Basten, Clark Hill, Detroit, MI, Janis E.S. Foley, Cooper, Straub, Toledo, OH, Kathleen H. McGuan, Reed, Smith, George D. Ruttinger, Crowell & Moring, Sarah M. Mathias, Jones, Day, Washington, DC, for defendants.

Angela K. Green, Niewald, Waldeck, Kansas City, MO, Richard W. Cohen, Lowey, Dannenberg, Bemporad & Selinger, PC, White Plains, NY, Karen N. Walker, Kirkland & Ellis, Washington, DC, movants.

Scott E. Perwin, Kenny Nachwalter, Seymour Arnold, Critchlow & Spector, PA, Miami, FL.

### ORDER NO. 24

### MEMORANDUM OPINION AND ORDER GRANTING SHERMAN ACT CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

EDMUNDS, District Judge.

Sherman Act Class Plaintiffs are direct purchasers, or their assignees, of Cardizem CD.[1] They allege that Defendants engaged in a continuing agreement, combination or conspiracy in restraint of trade and commerce in violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Specifically, Plaintiffs allege that they were injured and suffered damages as a result of Defendants' conduct including its September 24, 1997 Agreement ("HMRI/Andrx Agreement") which artificially fixed, inflated, maintained and stabilized the prices direct purchasers paid for Cardizem CD by delaying generic competition.[2] If a generic version of Cardizem CD had come onto the market earlier, as it would have but-for the Agreement, Plaintiffs argue, they would have substituted some of their Cardizem CD purchases with purchases of lower-priced generics. Defendants' illegal Agreement prevented them from doing so, forced them to pay an artificially inflated price and thus caused them to suffer an economic injury. Plaintiffs seek damages for that injury to be measured by the amount they were overcharged for those brand purchases that they would have substituted for a lower-priced generic. Plaintiffs further allege that, but-for the HMRI/Andrx Agreement and the delayed entry of generic competition, certain favored direct purchasers (e.g., governmental entities and facilities) would have received increased discounts on their purchases of Cardizem CD. Plaintiffs seek damages for those economic injuries as well.

■ Private damage actions under section 1 of the Sherman Antitrust Act must satisfy

---

1. Direct purchasers include drug wholesalers, chain pharmacies, independent pharmacies, food and drug stores, hospitals, clinics, long term care facilities, mail order pharmacies, and governmental agencies. *See* Schondelmeyer 6/14/00 Report at ¶¶ 52–53.

2. The Sherman Act Class Plaintiffs allege that the HMRI/Andrx Agreement is a horizontal market allocation agreement and is illegal per se under controlling federal case law because the Agreement allocated the entire United States market to HMRI and required HMRI to pay Andrx a portion of its illegally inflated profits. They also allege that the Agreement was an illegal price-fixing agreement because its purpose and effect was to ensure that HMRI would continue to be able to market Cardizem CD free from generic competition and thus would be able to charge supra-competitive prices for Cardizem CD *See* Consolidated Amended Class Action Complaint (hereinafter "Am. Complt.") at ¶ 50. Plaintiffs further allege that the HMRI/Andrx Agreement brought HMRI protection not only from Andrx's generic version of Cardizem CD but also protection from generic competition from Biovail and Faulding (which had received tentative FDA approval for its product on or about October 26, 1998) because these generic competitors could not market their products until Andrx's 180-day exclusivity period ended. *See id.* at ¶ 51. Plaintiffs seek damages and other relief for Defendants' violation of section 1 of the Sherman Act.

section 4 of the Clayton Act. Thus, to successfully prosecute their antitrust claims, Plaintiffs must prove three essential elements: (1) Defendants· violated section 1 of the Sherman Act; (2) Defendants' violation caused Plaintiffs to suffer some injury to their business or property (injury-in-fact or impact); and (3) "that the extent of this injury can be quantified with requisite precision." *In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y. 1996).

The first element has already been established. This Court has determined that the HMRI/Andrx Agreement is an agreement between horizontal competitors that allocates the entire United States market for Cardizem CD and its bioequivalents to Defendant HMRI, and thus constitutes a restraint of trade that has long been held illegal *per se* under section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. This Court further determined that the HMRI/Andrx Agreement constituted an illegal price fixing agreement. *See* Order No. 13, Mem. Op. & Order Granting Plaintiffs' Motions for Partial Summary Judgment dated June 6, 2000. The second and third elements remain at issue. These are the focal points of Defendants' challenge to Plaintiffs' motion for class certification which is presently before the Court.

Plaintiffs' motion seeks to have this case certified as a class action with the proposed class comprised of:

> All persons, or assignees of such persons, who have directly purchased Cardizem CD from HMRI at any time during the period July 9, 1998 through and after the date hereof until the effects of Defendants' illegal contract, combination or conspiracy cease and who also either (1) purchased generic versions of Cardizem CD; or (2) obtained increased discounts for their direct purchases of Cardizem CD after the generic versions belatedly entered the market.
> Excluded from the Class are Defendants and their officers, directors, management and employees, subsidiaries or affiliates. *Id.*

*See* Am. Complt. at ¶ 11; Plaintiffs' Reply Br. at 13, n.23 (proposing this amended class definition).

Plaintiffs' certification motion is brought pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. Plaintiffs, as the party seeking to certify a class, bear the burden of showing Rule 23's requirements have been satisfied. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *In re Am. Med. Sys.*, 75 F.3d 1069, 1079 (6th Cir. 1996). Finding that they have satisfied their Rule 23 burden, this Court **GRANTS** Plaintiffs' motion for class certification.

## I. Facts

The named Plaintiffs are Louisiana Wholesale Drug Company, Inc. ("Louisiana Wholesale"), a Louisiana corporation with its principal place of business in Louisiana, and Duane Reade, Inc. ("Duane Reade"), a Delaware corporation with its principal place of business in New York. It is alleged that Louisiana Wholesale bought Cardizem CD directly from Defendant HMRI during the class period. *See id.* at ¶ 6. It is further alleged that, during the class period, Duane Reade annually purchased between $500,000 and $800,000 of Cardizem CD from Defendant HMRI through its wholesaler, Kinray, Inc.[3] *Id.* at ¶ 7. Kinray, Inc. ("Kinray"), a New York ·corporation, purchased Cardizem CD directly from HMRI and sold it to Duane Reade during the class period. Kinray has assigned to Duane Reade its antitrust claims with regard to these direct purchases. *Id.* at ¶¶ 7–8.

In their motion for class certification, Plaintiffs assert that Defendants' illegal HMRI/Andrx Agreement caused at least some injury (measured at the point of purchase) to all direct purchaser class members because it forced them to pay artificially inflated or stabilized prices. Plaintiffs further assert that the adverse economic effects of the HMRI/Andrx Agreement continue despite its termination because price discounts on generics and their market share typically

---

**3.** Plaintiffs' assure the Court that Duane Reade is not a member of the end-payer class involved in the State Law Plaintiffs' litigation against these Defendants.

increase over time. *See* Plaintiffs' Br. at 1, 5, and Exhibit A. Plaintiffs intend to prove their claim with common evidence and methodologies showing that the HMRI/Andrx Agreement deprived all class members of the ability:

(1) to substitute a lower-priced generic for some of their Cardizem CD purchases;[4] or

(2) to obtain increased discounts on their direct purchases of Cardizem CD.

Plaintiffs also contend that class-wide evidence is available to estimate, with reasonable accuracy, aggregate damages for the class. Plaintiffs and their expert, Dr. Stephen Schondelmeyer, emphasize that they are seeking overcharge damages on their direct *purchases* measured by the differential between the actual prices they paid and the prices they would have paid but-for Defendants' antitrust violation. Plaintiffs are not seeking damages for lost profits from lost sales.

Plaintiffs' "overcharge" damage theory has two components:

(1) as to those class members that directly purchased Cardizem CD and subsequently purchased a generic version, "overcharge" damages are measured as the price difference between what these class members actually paid for the brand name drug (Cardizem CD) and the price Plaintiffs would have paid for the substituted generic but-for the HMRI/Andrx Agreement;[5] and

(2) as to those class members who are direct purchasers of Cardizem CD and who

have also obtained increased discounts after the generic versions of that drug belatedly entered the market, "overcharge" damages are measured as the price differential between what class members actually paid for the brand (Cardizem CD) and the lesser amount these favored purchasers (e.g. government entities and facilities) would have paid due to the larger discounts that would have been offered once generic competition entered the market.

Although the damages Plaintiffs seek are measured differently, each class member uniformly claims the same injury; i.e., that it paid a higher, artificially inflated price for its Cardizem CD purchases than it would have paid but-for the HMRI/Andrx Agreement.

Defendants challenge Plaintiffs' ability to satisfy the typicality and adequacy requirements of Rule 23(a) as well as their ability to satisfy the predominance and superiority requirements of Rule 23(b)(3). The Court first addresses Defendants' Rule 23(a) challenges. It then addresses their Rule 23(b)(3) challenges.

## II. Standards for Determining Class Certification

As stated above, Plaintiffs bear the burden of showing Rule 23's requirements have been satisfied. *See Amchem Prods.*, 521 U.S. at 614, 117 S.Ct. 2231; *In re Am. Med. Sys.*, 75 F.3d at 1079. As observed by the Sixth Circuit, "[t]he district court retains broad discretion in determining whether an action should be certified as a class action, and its

---

**4.** Plaintiffs' expert Dr. Schondelmeyer concludes that all or virtually all of direct purchasers fall within this category.

**5.** Plaintiffs' expert Dr. Schondelmeyer opines that virtually every wholesaler or other purchaser or reseller of Cardizem CD would be expected by its pharmacy customers to stock a generic version of Cardizem. Therefore, he concludes, based on the large prescription volume for this drug, it is reasonable to infer that every pharmacy in the United States of any appreciable size would stock Cardizem CD as well as one of its generic equivalents when available. Similar economic reasons would lead non-wholesaling direct purchasers to likewise purchase generics when available. Direct purchasers react to consumer demand for generics; they do not create it. Pharmacies choose a wholesaler in part

based on the expectation that the wholesaler will have a broad line of drug products available, including generic versions of popular brand name drugs like Cardizem CD. Moreover, most third party insurance and managed care programs have policies that encourage or even require use of a generic when available. Therefore, he opines, to meet these third party requirements, pharmacies would need to purchase generic versions of a drug when available. Accordingly, virtually every wholesaler or other direct purchaser of Cardizem CD would be expected by its pharmacy customers to stock a generic version of Cardizem CD as soon as it was available. *See* Schondelmeyer 6/14/00 Report at ¶¶ 54–57; Schondelmeyer Rebuttal Report at ¶¶ 29–30.

decision, based upon the particular facts of the case, should not be overturned absent a showing of abuse of discretion." *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir.1988). Nonetheless, the Court must "conduct a 'rigorous analysis' into whether the prerequisites of Rule 23 are met before certifying a class." *In re Am. Med. Sys.*, 75 F.3d at 1078–79 (citing *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).

█ In determining a motion for class certification, courts do not examine the merits of the plaintiffs' underlying claims. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). "A Rule 23 determination is wholly procedural and has nothing to do with whether a plaintiff will ultimately prevail on the substantive merits of its claim." *Little Caesar Enter. v. Smith*, 172 F.R.D. 236, 241 (E.D.Mich.1997). Courts also assume that the substantive allegations of the complaint are true and that cognizable claims are stated. *See Eisen*, 417 U.S. at 178, 94 S.Ct. 2140. "Nonetheless, the Court must undertake an analysis of the issues and the nature of required proof at trial to determine whether the matters in dispute and the nature of plaintiffs' proofs are principally individual in nature or are susceptible of common proof equally applicable to all class members." *Little Caesar*, 172 F.R.D. at 241. "[W]hen a court is in doubt as to whether to certify a class action, it should err in favor of allowing a class." *Id.*

## III. Analysis

### A. Rule 23(a) Analysis

Fed.R.Civ.P. 23(a) contains four prerequisites that must be met before a court may certify a class. These prerequisites are known as the numerosity, commonality, typicality, and adequacy requirements. Defendants challenge Plaintiffs' ability to satisfy the typicality and adequacy requirements under Rule 23(a). There is no attempt to dispute Plaintiffs' ability to satisfy the nu-

merosity and commonality requirements.[6] Nonetheless, the Court must consider each factor.

### 1. Numerosity

█ Fed.R.Civ.P. 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." This is not a difficult burden to satisfy, and Defendants do not raise any real challenge to Plaintiffs' ability to do so here. Plaintiffs need not prove the exact size of the proposed class, but rather must demonstrate only that the number is sufficiently large so as to make joinder impracticable. "A finding of numerosity may be supported by common sense assumptions, and it is especially appropriate in antitrust actions brought under Rule 23(b)(3)." *In re Playmobil Antitrust Litig.*, 35 F.Supp.2d 231, 239 (E.D.N.Y.1998) (citing 4 *Newberg on Class Actions*, § 18.03, n. 17 (2d ed.1985)). Plaintiffs indicate that there are approximately 80 direct purchasers of Cardizem CD that fall within the defined class, and further assert that joinder would be impracticable because the class size is significant and class members are geographically dispersed throughout the United States. *See In re Playmobil Antitrust Litig.*, 35 F.Supp.2d at 239–40. The Court agrees and finds that the numerosity requirement of Rule 23(a)(1) is satisfied.

### 2. Commonality

█ The commonality prerequisite of Rule 23(a)(2), requiring that "there be questions of law or fact common to the class", is also satisfied. Defendants do not challenge this conclusion. This test requires only some common questions; not a predominance of common questions as required under Rule 23(b)(3). It is "qualitative rather than quantitative, that is, there need be only a single issue common to all members of the class." *In re Am. Sys.*, 75 F.3d at 1080 (internal quotes and citation omitted). Not every common issue will suffice. Courts look for common issues where resolution will advance

---

6. Defendants challenge the numerosity of the class only in the context of Rule 23(b)(3)'s superi-
ority requirement.

the litigation. *See Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 397 (6th Cir.1998).

Plaintiffs allege here that each member of the proposed class was injured by Defendants' illegal agreement which fixed prices and allocated the entire U.S. market for Cardizem CD and its bioequivalents. Common questions of law and fact include whether Defendants' conduct caused injury to Plaintiff class members; and, if so, a determination of the appropriate damages. Resolution of these common issues will advance this antitrust litigation. "It is well established that class actions are particularly appropriate for antitrust litigation concerning price-fixing schemes because price-fixing presumably subjects purchasers in the market to common harm." *In re Playmobil Antitrust Litig.,* 35 F.Supp.2d at 240 (citing cases).

### 3. Typicality

■ Fed.R.Civ.P. 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Defendants challenge Plaintiffs' ability to satisfy this requirement. "The typicality requirement is said to limit the class claims to those fairly encompassed by the named plaintiffs' claims." *General Tel. Co. v. E.E.O.C.,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys.,* 75 F.3d at 1082 (quoting 1 *Newberg on Class Actions,* § 3–13, at 3–76 (footnote omitted)). "A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *Id.* (citing 1 Newberg, supra, § 3.13, at 3–75). Courts considering this prerequisite have observed that "claims in antitrust price-fixing cases generally satisfy Rule 23(a)(3)'s typicality requirement, even if members purchase different quantities and pay different prices." *In re Playmobil Antitrust Litig.,* 35 F.Supp.2d at 241 (citing *In re Potash Anti-*

*trust Litig.,* 159 F.R.D. 682, 691 (D.Minn. 1995)).

"Typicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff." *In re Playmobil Antitrust Litig.,* 35 F.Supp.2d at 242. "As one court noted: 'there is nothing in Rule 23(a)(3) which requires named plaintiffs to be clones of each other or clones of other class members.' " *Id.* (quoting *In re Catfish Antitrust Litig.,* 826 F.Supp. 1019, 1036 (N.D.Miss.1993)).

Here, as in other antitrust cases, the claims of the named representatives and the claims of the class members arise from the same events; they claim injury from the same HRMI/Andrx Agreement that this Court has found to be a *per se* violation of section 1 of the Sherman Antitrust Act. Their claims are typical of the class claims because each is a direct purchaser, or assignee of a direct purchaser, of Cardizem CD, and each claims that they were forced to pay an artificially inflated price for their purchases as a result of Defendants' illegal conduct.

Defendants argue that Duane Reade, Inc.'s claims are not typical of the claims of the class because (1) it is an indirect purchaser with an invalid assignment of a direct purchaser's antitrust claims; (2) the damage amount it seeks as an assignee is small in comparison to those of other class members; and (3) as an assignee, it does not have the same type of on-going relationship with Defendants as others in the class and thus its incentives to settle or pursue this litigation may conflict with those of the class. The Court does not find Defendants' arguments persuasive.

■ Defendants' first argument is not convincing. Defendants contend that Duane Reade's claims are atypical because they are subject to a unique defense; i.e., the assignment of Kinray, Inc.'s antitrust claims to Duane Reade is void under New York "champerty" law. The presence of a unique defense will not automatically destroy typicality. *See In re Synthroid Mktg. Litig.,* 188 F.R.D. 287, 291 (N.D.Ill.1999). It is only when the defense will "skew the focus of the litigation" and create "a danger that absent

class members will suffer if their representative is preoccupied with defenses unique to it." *Alaska v. Suburban Propane Gas Corp.*, 123 F.3d 1317, 1321 (9th Cir.1997) (internal quotes and citation omitted). *See also In re Synthroid Mktg. Litig.*, 188 F.R.D. at 291.

■ The assignment issue Defendants' raise presents a question of law that can readily be resolved by the Court without skewing the focus of the litigation or creating a significant danger of distracting Duane Reade's ability to pursue the interests of the absent class members. Contrary to Defendants' arguments, it does not present a unique defense that will consume the merits of this litigation.

Duane Reade convincingly argues that: (1) a private right of action under the federal antitrust laws is assignable, and the assignee may recover treble damages and attorneys' fees; and (2) federal law, not state law, governs the assignment of federal claims. Its argument finds support in *Gulfstream III Assocs. v. Gulfstream Aero. Corp.*, 995 F.2d 425, 437 (3d Cir.1993). In that case, the Third Circuit Court of Appeals observed that "[t]here is no serious doubt that an antitrust claim can be expressly assigned . . . .; indeed, it is commonplace for individual persons claiming antitrust injury to assign their claims to an association formed for the specific purpose of pursuing litigation." The court further observed that "it is also clear that the validity of the assignment of an antitrust claim is a matter of federal common law." *Id.* An express assignment would "entirely eliminate[ ] any problems of split recoveries or duplicative liability. There would be nothing to prevent a direct purchaser from expressly assigning its antitrust claims to a remote purchaser". *Id.*

If the Court is ultimately convinced that federal common law governs, New York law to the contrary will be immaterial. The Duane Reade/Kinray assignment expressly assigns Kinray's antitrust claims. Thus, Duane Reade will stand in Kinray's shoes, and its claims will arise from the same

HMRI/Andrx Agreement that gives rise to the other class members' claims.

Defendants' second argument is similarly unavailing. Duane Reade's claims are not atypical because they are for a smaller dollar amount than the claims of many in the class. "Differences in the damages sustained by individual class members does not preclude a showing of typicality, nor defeat class certification." *In re Playmobil Antitrust Litig.*, 35 F.Supp.2d at 242.

Defendants' remaining arguments, asserting that Duane Reade's interests conflict with those of the class, are best analyzed under the adequacy requirement. *See In re Potash Antitrust Litig.*, 159 F.R.D. at 692.

### 4. Adequacy

■ Fed.R.Civ.P. 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." This requirement is essential to due process as a final judgment is binding on all class members. *See Hansberry v. Lee*, 311 U.S. 32, 42, 61 S.Ct. 115, 85 L.Ed. 22 (1940). To satisfy this requirement Plaintiffs must show that: (1) the representatives' interests do not conflict with the class members' interests, and (2) the representatives and their attorneys are able to prosecute the action vigorously. *See In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. at 512. Defendants do not raise any challenges as to the representatives' or counsel's ability to prosecute this action vigorously. Rather, they argue that the representatives' interests conflict with those of the class.

### a. Duane Reade

■ As to Duane Reade, Defendants argue that it is a member of both the direct and indirect class actions and this dual presence creates an inherent conflict of interest and the danger of a "double recovery."[7] The Court is convinced otherwise. Plaintiffs assure the Court that Duane Reade's Sherman Act claim is brought solely as an assignee. It is not a member of both the direct and indirect purchaser class actions. Ac-

7. State Law Plaintiffs in this multi-district litigation are similarly seeking class certification of their claims asserting the same facts asserted here and alleging violations of state antitrust and unfair competition laws.

cordingly, there is no inherent conflict of interest between this named representative and the absent members of the class. There is also no danger of a double recovery. Nor is there any evidence that a conflict is created either by its less intimate relationship with Defendants or by its smaller financial interest in the litigation. *See In re S. Cent. States Bakery Prods. Antitrust Litig.*, 86 F.R.D. 407, 418 (M.D.La.1980) (observing that the named plaintiff's financial interest in the outcome of the suit "is not determinative of his ability to represent the class adequately"). To defeat class certification, "the conflict must be more than merely speculative or hypothetical." 5 *Moore's Federal Practice*, § 23.25[4][b][ii] at 23–119 (citing *In re Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prod. Liab. Litig.*, 164 F.R.D. 222, 229 (S.D.Ohio 1995)).

Duane Reade is an adequate class representative under Rule 23(a)(4) because its interests are fully consistent with those of the Sherman Act Class Plaintiffs. Each has the same interest of establishing the injury and damage elements of their antitrust claim. Moreover, Rule 23 provides this Court with considerable flexibility to deal with conflicts if and when they arise. *See In re NASDAQ*, 169 F.R.D. at 513.

### b. Louisiana Wholesale

■ Defendants argue that Louisiana Wholesale is not an adequate class representative for the direct purchaser class because it is owned entirely by indirect purchasers and therefore *may not* act in the best interests of the direct purchaser class and *may* have interests that are antagonistic to the class. Similar unsupported claims of possible conflicts of interest are routinely rejected by the courts. "A naked allegation of antagonism cannot defeat class certification; there must be an actual showing of a real probability of a potential conflict which goes to the subject matter of the suit." *In re S. Cent. States Baking Prods. Antitrust Litig.*, 86 F.R.D. at 418. Defendants' arguments about potential conflicts are thus insufficient to deny class certification. "[I]n order to warrant denial of class certification, it must be shown that any asserted 'conflict' is so palpa-

ble as to outweigh the substantial interest of every class member in proceeding with the litigation. Defendants have not made this showing." *In re NASDAQ*, 169 F.R.D. at 514–15. Despite Defendants arguments here, it is not disputed that Louisiana Wholesale is a direct purchaser. The fact that its shareholders are independent retail pharmacists is irrelevant to this determination.

Defendants also argue that Louisiana Wholesale's damage claim is inconsistent with the claims of the class and thus creates a conflict of interest. Defendants are mistaken. Louisiana Wholesale, just like all members of the class, asserts an overcharge theory of damages. The fact that Louisiana Wholesale's president testified that he believes Defendants' illegal agreement may have also caused the company to incur higher inventory costs in no way renders Louisiana Wholesale's overcharge claim inconsistent with those of the class. Neither Louisiana Wholesale nor any member of the class is seeking damages related to higher inventory costs. Such claims would be for lost profits which Plaintiffs are not pursuing. Accordingly, a "belief" held by a corporate representative regarding damages not sought here is simply irrelevant.

Defendants' final argument, that Louisiana Wholesale is an inadequate class representative because it has filed other lawsuits raising similar claims against other defendants, is likewise unconvincing. Louisiana Wholesale's status as a class representative in two other lawsuits involving illegal agreements similar to the HMRI/Andrx Agreement does not subject it to unique defenses. Defendants have not presented the Court with any evidence that Louisiana Wholesale filed these other suits for an improper purpose. Accordingly, the mere fact that it has filed other suits does not render it an inadequate class representative.

In light of the above, this Court concludes that Plaintiffs have satisfied their burden under Rule 23(a). In addition to satisfying all the criteria of Rule 23(a), Plaintiffs must also satisfy the requirements of Rule 23(b)(3). The parties focus on Rule 23(b)(3)'s predominance requirement, and the Court addresses that issue first. It then turns its

attention to Rule 23(b)(3)'s superiority requirement.

### B. Rule 23(b)(3) Analysis

The Court's task under Rule 23(b)(3) is to determine whether common questions of law or fact predominate over individual ones and whether the proposed class action is superior to other available methods of adjudication. "[T]he Court must scrutinize the evidence plaintiffs propose to use in proving their claims without unnecessarily reaching the merits of the underlying claims." *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 684 (N.D.Ga.1991).

### 1. Predominance

■ "There are no bright lines for determining whether common questions predominate. Instead, considering the facts of the case presented, a claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position. Common questions need only predominate: they need not be dispositive of the litigation." *In re Potash Antitrust Litig.*, 159 F.R.D. at 693 (internal citations omitted). "The predominance requirement is satisfied unless it is clear that individual issues will overwhelm the common questions and render the class action valueless." *In re NASDAQ*, 169 F.R.D. at 517.

In determining whether Rule 23(b)(3)'s predominance requirement is satisfied here, this Court must consider yet distinguish: (1) how Plaintiffs intend to prove that they paid an artificially inflated price for their Cardizem CD purchases as a result of Defendants' antitrust violation (fact of injury or impact); and (2) how Plaintiffs' intend to prove the "overcharge" damages they claim resulted from that injury (damage amount). The Court will examine first the proofs as to the impact or fact of injury element of Plaintiffs' case, and then will consider Plaintiffs' proofs as to the damage element of its antitrust claim.

#### a. Impact Is Susceptible to Class–Wide Proof

##### (i) Plaintiffs' Burden at Class Certification Stage

The fact of injury or "impact" is an essential element of Plaintiffs' antitrust claim and requires proof that Plaintiffs suffered some injury that was caused by Defendants' antitrust violations. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114, n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Martino v. McDonald's Sys.*, 86 F.R.D. 145, 147 (N.D.Ill.1980). "The fact of injury may be established by inference or circumstantial evidence." ABA Section of Antitrust Law, *Antitrust Law Developments* (4th ed.1997) at 783 (citing *Zenith*, 395 U.S. at 125, 89 S.Ct. 1562; *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 700, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962)).

If generalized evidence exists which will prove or disprove this injury element on a simultaneous class-wide basis, then there is no need to examine each class members' individual circumstance as Defendants claim. Such an examination will relate to the quantum of damages; not the fact of injury. *See Zenith*, 395 U.S. at 114, n. 9, 89 S.Ct. 1562 (observing that the antitrust plaintiff's "burden of proving fact of damage under § 4 of the Clayton Act is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage."). *Accord Martino*, 86 F.R.D. at 147 (observing that the "[f]act of damage pertains to the existence of injury, as a predicate to liability; actual damages involve the quantum of injury, and relate to the appropriate measure of individual relief"). To show impact is susceptible to class-wide proof, Plaintiffs are not required to show that the fact of injury actually exists for each class member. *See In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 618 (N.D.Ga.1997) (observing that "Plaintiffs must show that antitrust impact can be proven with common evidence on a classwide basis; Plaintiffs need not show antitrust impact in fact occurred on a classwide basis.").

### (ii) Plaintiffs' Burden is Satisfied; Common Evidence Exists to Prove Impact on a Class–Wide Basis

██ Plaintiffs assert that Defendants' illegal HMRI/Andrx Agreement caused at least some injury (measured at the point of purchase) to all direct purchaser class members because it forced them to pay artificially inflated or stabilized prices. Plaintiffs intend to prove the impact element of their claim with common evidence and methodologies showing that the HMRI/Andrx Agreement deprived all class members of the ability:

(1) to substitute a lower-priced generic for some of their Cardizem CD purchases; or

(2) to obtain increased discounts on their direct purchases of Cardizem CD.

Plaintiffs' proposed generalized evidence includes:

(1) governmental and academic studies showing that the entry of a generic drug on the market results in: (a) significant savings for direct purchasers and greater market share for the generic drug because purchasers substitute the brand for the generic and save money ("substitution effect"); and (b) certain direct purchasers of the brand drug derive savings once the generic enters the market because they are offered a larger discount or rebate off the list price of the brand drug;

(2) Defendants' own models and forecasts predicting significant generic penetration and cheaper prices;

(3) actual marketplace behavior and data identifying direct purchasers of Cardizem CD, the strong substitution effect in the market at issue here, the quantities/prices of class members' purchases of Cardizem CD and generic alternatives, and the savings that direct purchases have derived since generic entry;

(4) Defendants' pricing practices as reflected in internal documents and sales data; and

(5) Plaintiffs' expert Dr. Schondelmeyer's conclusions that: (a) all or substantially all direct purchasers would have substituted a generic for some of their brand Cardizem CD purchases (at a lesser price) if the generic were available; (b) earlier entry of a competing generic would have permitted substitution and resulted in significant competition for both price and unit share between the generic and Cardizem CD; (c) the net price of brand Cardizem CD (even with the maximum discount) would always be greater than the net price for the generic for the same customer thus resulting in some economic impact from Defendants' antitrust violation; and (d) earlier competition would also have provided certain favored direct purchasers; e.g., government entities and facilities, with a larger discount on their Cardizem CD purchases.

Plaintiffs have met their burden by showing that generalized evidence exists which will prove or disprove the impact element of their antitrust claim on a simultaneous, class-wide basis. This proof obviates the need to examine each class member's individual position. *See In re Potash Antitrust Litig.*, 159 F.R.D. at 693. Whether Plaintiffs will succeed or not in proving class-wide impact is a merit-based question that is not considered at the class certification stage of litigation. *See Eisen*, 417 U.S. at 177, 94 S.Ct. 2140; *Little Caesar Enter.*, 172 F.R.D. at 241; *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. at 684.

### (iii) Defendants' Arguments Are Not Persuasive

Defendants' arguments to the contrary are unavailing. Defendants' core premise is familiar; i.e., that individual issues among class members will predominate because a finding of injury-in-fact cannot be determined without assessing each individual class member's economic circumstances. *See Alabama v. Blue Bird Body Co.*, 573 F.2d 309 (5th Cir. 1978); *Windham v. Am. Brands, Inc.*, 565 F.2d 59 (4th Cir.1977) (en banc); *Am. Custom Homes, Inc. v. Detroit Lumberman's Ass'n*, 91 F.R.D. 548 (E.D.Mich.1981); *Dry Cleaning & Laundry Inst. of Detroit, Inc. v. Flom's Corp.*, No. 91–CV–76072–DT, 1993 WL 527928 (E.D.Mich. Oct. 19, 1993). Although Defendants' core premise is familiar, some of their arguments are more unusual. Each is discussed more fully below.

### (a) Proper Focus is on Fact of Injury; Not Amount of Injury

As an initial matter, the Court observes that Defendants' arguments "although couched in terms of common impact, [are] directed both at proof of the quantum of damage Plaintiffs suffered and proof of the fact of injury. To the extent Defendants focus on the quantum of damage suffered in their common impact analysis, however, their focus is misplaced. Common proof of impact is possible without common damage amounts." *In re Potash Antitrust Litig.*, 159 F.R.D. at 694.

### (b) Plaintiffs Seek Damages for Overcharges; Not Lost Profits

 Defendants insist that a lost profit measure of damages, rather than Plaintiffs' overcharge measure of damages, should be applied here. The lost profit measure, they contend, more accurately accounts for the fact that (1) Plaintiffs are business entities that have the ability to make profits from the resale of their purchases; and (2) this case involves a choice between two different products thus distinguishing it from other price-fixing cases that apply an overcharge measure of damages. Once the Court recognizes that the lost profit measure is appropriate here, Defendants assert, it will also recognize that the calculation of lost profits is inherently an individual one. Thus, impact cannot be established on a class-wide basis with common evidence. The Court is not persuaded by Defendants' arguments. They misconstrue and overly complicate Plaintiffs' injury and damage theories by attempting to transform Plaintiffs' claim into one for "lost profits." [8]

Defendants admit that Plaintiffs' proposed overcharge measure is the most common method for determining damages in a price-fixing case. *See* Defs.' Br. at 15. Nonetheless, they argue that a lost-profit measure is more appropriate in this price-fixing case because Plaintiffs' overcharge analysis dramatically overstates the extent of Plaintiffs' damages. *See id.* at 16. There is some

commentary supporting Defendants' position. The authors note, however, that their position is at odds with prevailing Supreme Court precedent. *See* II Phillip E. Areeda, Herbert Hovenkamp and Roger D. Blair, *Antitrust Law*, ¶ 346a at 359–360 and ¶ 346k at 378 (2d ed.2000) (observing that the authors' position "is at variance with the case law"; i.e., *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) and *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), but nonetheless concluding that "awarding damages measured as the full overcharge to direct purchasing intermediaries is wrong on grounds of both statutory language and general damage principles" and further observing that "[t]he obvious difficulty with denying damages for consumers buying from an intermediary is that they are injured, often more than the intermediary, who may also be injured but for whom the entire overcharge is a windfall"). Defendants' lost profit argument, although thought-provoking, will not defeat class certification.

Defendants' lost profit arguments misconstrue the allegations in Plaintiffs' complaint, promote a measure of damages that allows for a recovery of an element of damages that Plaintiffs do not seek, and create a straw man argument that introduces individual questions into this suit that are not present under Plaintiffs' overcharge measure of damages. Plaintiffs are not seeking damages for lost profits from lost sales. Rather, in this horizontal price-fixing case, Plaintiffs allege that they purchased price-fixed goods directly from Defendants; the participants in the price-fixing conspiracy at issue here. Accordingly, "[t]he typical measure of damages is the difference between the actual price and the presumed competitive price multiplied by the quantity purchased. This was the calculation that the Supreme Court approved in *Chattanooga Foundry [& Pipe Works v. Atlanta*, 203 U.S. 390, 396, 27 S.Ct. 65, 51 L.Ed. 241 (1906) ]." ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Eco-*

---

**8.** Lost profits "means the difference between the firm's actual profits during the damage period and the profits it would have made but for the illegal conduct." ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, Ch. 2, "Standards of Proof" at 36 (1996).

*nomic Issues,* Ch. 6, "Overcharges" at 172 (1996).

Plaintiffs are purchasers of Defendants' products; not their competitors. They claim an injury to their property as a result of Defendants' illegal price-fixing agreement. They do not come before the Court as Defendants' rivals arguing that the HMRI/Andrx Agreement illegally excluded them from the market and caused them to suffer lost sales and lost profits. If they were competitors claiming injury to their business, Defendants' arguments for a lost profit measure of damages would be more persuasive. "When the plaintiff is *not a consumer of the price-fixed product,* when, in other words, the plaintiff is injured in its business as opposed to its property, the most theoretically accurate measure of the injury it sustains is the profits it loses because of the increased costs it incurs as a result of the anticompetitive increase in the price of the input." *Id.* at 183 (emphasis added). Defendants' lost profit arguments ignore the fact that "[t]he most important characteristic in determining the appropriate kind of damages is the plaintiff's economic relationship to the defendant." *Id.* at 169 (emphasis added).

Using an example somewhat analogous to the facts alleged here, the authors of Chapter 6 of the ABA *Proving Antitrust Damages* treatise illustrate this connection. Where "a group of suppliers conspires to drive a more efficient competitor out of the market or, equivalently, prevent a more efficient supplier from entering the market", the excluded supplier (competitor) "would have a claim for antitrust damages based on lost profits" and "*purchasers* from the conspirators would also have antitrust claims because they pay higher prices as a result of the exclusionary practice." *Id.* at 193 (emphasis added). The purchasers' antitrust damages would be based on the overcharge they paid measured by "the difference between the price actually paid and the price that would have been paid absent collusion, multiplied by the quantity." *Id.* at 193–94.

Here, it is alleged that Defendants' HMRI/Andrx Agreement protected HMRI from competition from Andrx's generic version of Cardizem CD. It is also alleged that it pro-

tected HMRI from generic competition from Biovail and Faulding (which had received tentative FDA approval for its product on or about October 26, 1998) because these generic competitors could not market their products until Andrx's 180–day exclusivity period ended. Thus, according to the above example, the fact that these excluded generic suppliers would arguably have a claim for antitrust damages based on lost profits would not preclude Plaintiffs from pursuing antitrust damages based on the overcharges they paid as purchasers of price-fixed goods.

Contrary to his position here, Defendants' expert Dr. Blair has observed that it is standard practice for *purchasers* to recover overcharges in a price-fixing/market allocation case such as this and that the basic measure of damages is "the difference between the price actually paid and the price that would have been paid absent collusion, multiplied by quantity." *Id.* at 193–94. Also contrary to his position here, Dr. Blair has observed that: "[o]vercharge damages . . . were recognized ·by the Supreme Court primarily because of the difficulty of proving lost profits in price fixing cases. Rather than require the complex netting associated with lost profits, and thus practically deny recovery, the Court permitted Plaintiffs to prove damages by showing a price enhancement." Roger D. Blair and William H. Page, *"Speculative" Antitrust Damages,* 170 Wash. L.Rev. 423, 433 (April 1995) (citing *Chattanooga Foundry & Pipe Works v. Atlanta,* 203 U.S. 390, 396, 27 S.Ct. 65, 51 L.Ed. 241 (1906)). *See also* II Areeda, Hovenkamp, and Blair, *Antitrust Law,* ¶ 394b at 529 (observing that "[i]n spite of the (arguably) theoretical superiority of lost profits as a measure of damages in a price-enhancement case, nearly all plaintiffs claim damages on the basis of an overcharge calculation").

Plaintiffs' injury and damage theory find support in the law, economics, and the pharmaceutical industry. Defendants' strained attempts to distinguish the facts of this case from other price-fixing cases are to no avail. Cardizem CD and its AB-rated generics are identical in all material respects. AB-rated generics are freely substitutable and interchangeable with their brand name counter-

parts. Industry experts describe them as perfect substitutes for the brand name drug. Defendants' hypotheticals (e.g., Seiko v. Rolex watches) are unavailing as they fail to recognize that the pharmaceutical market is fundamentally different from the market for other products. In the pharmaceutical industry, there is a government-assured complete interchangeability of drug products. This is why pharmacies are allowed to substitute the lower-priced generic versions of brand name drug products that have been demonstrated to the FDA to be therapeutically equivalent. *See* Schondelmeyer 11/8/00 Rebuttal Report at ¶¶ 16–17. Market behavior, which shows generics capturing a significant percentage of the branded drug market soon after they are introduced, likewise supports the conclusion that the brand and generic drugs are essentially fungible and interchangeable.[9] *See id.* Cardizem CD and its generic bioequivalents are two interchangeable versions (one less costly than the other) of the same drug product. Antitrust law requires only that the two products at issue be close substitutes for each other. Cardizem CD and its generic bioequivalents meet this requirement.

The fact that Defendants' expert disagrees with Plaintiffs' expert as to the proper measure of damages is neither surprising nor relevant. Such merit-based arguments are inappropriate at the class certification stage of the litigation. *See Eisen,* 417 U.S. at 177, 94 S.Ct. 2140. At this stage, the Court should not delve into the merits of an expert's opinion or indulge "dueling" between opposing experts. *See In re Visa Check/Mastermoney Antitrust Litig.,* 192 F.R.D. 68, 79 (E.D.N.Y.2000). This case, like many antitrust cases, "presents the familiar 'battle of the experts.' The certification stage of this litigation is not, however, the proper forum in which to resolve this battle. . . . Without trenching on the merits, in considering a class certification motion, a court must consider only whether plaintiffs have made a threshold showing that what proof they will offer will be sufficiently generalized in nature that . . . the class action

will provide a tremendous savings of time and effort." *In re Potash Antitrust Litig.,* 159 F.R.D. at 697 (internal quotes and citations omitted). *See also In re Disposable Contact Lens Antitrust Litig.,* 170 F.R.D. 524, 531–32 (M.D.Fla.1996) (observing that disagreement between the parties' experts and the ultimate success of the plaintiffs' expert's opinions in persuading the jury are not reasons to deny class certification; rather, for purposes of a class certification motion, the court determines whether the plaintiffs' "allegations and the methodology they will advance to prove their claims are sufficient to satisfy Rule 23.").

This does not end our inquiry. Defendants' insist that, even if lost profits are not viewed as the appropriate measure of damages in this case, individual issues will also predominate under Plaintiffs' overcharge theory. They advance three primary arguments in support of this position. The Court addresses each, beginning with Defendants' by-pass or offsetting benefits argument.

**(c) Defendants' By–Pass or Offsetting Benefits Arguments Relate to Quantum of Damages; Not Fact of Injury**

█ Defendants first contend that individual issues will predominate under Plaintiffs' overcharge theory because (1) Plaintiffs must offset from their overcharge damage estimate any "benefits" they may have received as a result of Defendants' illegal price-fixing agreement; (2) individual inquiry is necessary to determine how much of a benefit is to be deducted from each class member's overcharge damage estimate; and (3) if the "benefit" proves to be greater than the overcharge damage estimate, then there is no injury in fact and thus no antitrust liability. The Court is not persuaded by Defendants' arguments. To reach the conclusion Defendants advance, one must traverse a tortured path; one that finds no support in the cases Defendants' rely upon. Defendants' arguments here ignore what the ABA Section of Antitrust Law observed in its treatise *Proving Antitrust Damages:*

9. This claim is also supported by Plaintiffs' proffered evidence showing that Andrx captured more than 50% of HMRI's market share for

Cardizem CD within seven months of its entrance on the market.

The measure of damages that is commonly used in price fixing cases is based on the overcharge itself. Simply put, the plaintiff's damages depend on the differences between the actual price paid and the competitive price, or the price that would have been charged absent the illegal agreement. Early on, the Supreme Court recognized the overcharge as the principal measure of harm in price fixing cases. The overcharge measure has the virtues of conceptual simplicity, theoretical justification, even if imperfect, and relative ease of calculation.

*Proving Antitrust Damages*, Ch. 6, "Overcharges" at 171 (citing *Chattanooga Foundry & Pipe Works v. Atlanta*, 203 U.S. 390, 396, 27 S.Ct. 65, 51 L.Ed. 241 (1906)).

Denying that this is a "lost profit" argument, Defendants assert that a class member cannot prove an injury-in-fact unless it can show that its business' bottom line would have been "better off" if Andrx had come to market in 1998. Defendants insist that Plaintiffs' injury analysis must account for a by-pass phenomenon which occurred in 1999 *after* Andrx entered the market with its generic version of Cardizem CD.[10] When it finally did enter the market in 1999, a subsidiary of Andrx, Anda, began selling Andrx's generic Cartia XT directly to some of the wholesaler class members' customers thus allowing Andrx to bypass the wholesaler.

Observing that some wholesaler class members may have lost profits because they may have lost some sales to Anda or because they may have been forced to buy Cartia XT indirectly at a higher price, Defendants contend that some wholesaler class members may have been "worse off" if Andrx entered the market in 1998. Accordingly, they argue, each class member must now "off-set" or deduct from their overcharge damage estimate the "benefit" they would have received in the "but-for" world due to Defendants' illegal price-fixing agreement; i.e., profits later lost after Andrx finally entered the market and its subsidiary began selling its gener-

ic version of Cardizem CD directly to some retailers. If a class member would have suffered an individual net loss under this analysis, Defendants further argue, then it cannot prove that it in fact suffered an injury. To determine how much of a benefit is to be deducted from the overcharge damage estimate, Defendants' assert, requires individual examination. Accordingly, Defendants conclude, individual issues will predominate over common ones.

The cases Defendants rely upon do not support their position for obvious reasons. The analysis upon which Defendants' build their "offsetting benefits" argument concerns the computation of damages or standing issues; not the fact of injury. In *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), the Court adopted a fault-based offset damage theory that requires a plaintiff who is a party to an illegal restraint to offset the benefits it received as a result of that restraint against the damages it also suffered as a result of the restraint. The Court observed that:

> [t]he possible beneficial byproducts of a restriction from a plaintiff's point of view can of course be taken into consideration *in computing damages*, but once it is shown that the plaintiff did not aggressively support and further the monopolistic scheme as a necessary part and parcel of it, his understandable attempts to make the best of a bad situation should not be a ground for completely denying him the right to recover, which the antitrust acts give him.

*Id.* at 140, 88 S.Ct. 1981 (emphasis added). Accordingly, the Court held, "the doctrine of *in pari delicto*, with its complex scope, contents, and effects, is not to be recognized as a defense to an antitrust action." *Id. Perma Life* does not support Defendants' "no injury" argument. It is limited to the calculation of damages. Moreover, Plaintiffs are not parties to the illegal HMRI/Andrx Agreement, and thus the fault-based offset damage theory set forth in *Perma Life* is irrelevant to both their injury and damage claims.

---

**10.** The phenomenon is most prevalent during the first 180 days after Andrx's entry when other generic alternatives were precluded from entry. Plaintiffs present evidence supporting their claim

that when second and third generic versions of the brand name drug enter the market, price competition is enhanced and generic market share increases.

Defendants' reliance on *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502–04, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), is similarly misplaced. The discussion Defendants highlight in *Hanover Shoe*, concerns challenges "about *the manner in which damages were computed* by the courts below." *Id.* at 502, 88 S.Ct. 2224 (emphasis added). Contrary to Defendants' arguments here, the Supreme Court in *Hanover Shoe* did not require "consideration of the benefits of anticompetitive conduct in determining injury." Defs. Suppl. Br. at 4. The *Hanover Shoe* Court turned to damage computation issues after concluding that the fact of injury had been established:

> We think it sound to hold that when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of § 4.

*Id.* at 489, 88 S.Ct. 2224. As the Tenth Circuit Court of Appeals recently observed in *Sports Racing Serv., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874 (10th Cir.1997):

> United Shoe defended in part on the ground that Hanover had passed on the overcharge to its customers and therefore suffered no injury. *See id.* at 487–88, 88 S.Ct. 2224. The Court rejected this defense, holding that the injury occurs and is complete when the defendant sells at the illegally high price (even if the buyer is only an intermediary buyer)....

*Id.* at 883 (citing *Hanover Shoe*, 392 U.S. at 489, 88 S.Ct. 2224).

Turning to the computation of damages, the *Hanover Shoe* Court agreed that certain capital costs should be factored into the purchase price for machines the plaintiff claimed it would have purchased (instead of leased) but for the defendant's illegal act of monopolization. With this addition, the overcharge damage amount would more accurately reflect the difference between the actual lease or rental price paid and the purchase price the plaintiff would have paid for the machines absent the antitrust violation. *Accord Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1366–

68 (9th Cir.1986). This is very different from what the Defendants are advocating here. This point is further illustrated in the *Los Angeles Memorial Coliseum* decision.

In *Los Angeles Memorial Coliseum*, a lost profits damage case, the Ninth Circuit Court of Appeals discussed a non-fault based damage offsetting theory. The court observed that this damage offset theory "is based on general principles of damages which limit a plaintiff's recovery under the antitrust laws to compensation for the 'net' injury incurred as a result of the defendant's antitrust violation." *Id.* at 1366. To illustrate this point, the court examined the decision in *Hanover Shoe*. In *Hanover Shoe*, the plaintiff alleged that it would have bought rather than leased certain machinery from the defendant but for the defendant's illegal act of monopolization and therefore sought damages in the amount it was overcharged under the defendant's leasing policy. The *Los Angeles Memorial Coliseum* court observed that "the [*Hanover Shoe*] Court offset against the plaintiff's gross antitrust damages (the rental price paid for leasing the machines) the amount plaintiff would have paid to purchase the machines absent the 'lease-only' restraint of trade." *Id.* at 1368 (citing *Hanover Shoe*, 392 U.S. at 487, 88 S.Ct. 2224). In other words, the *Hanover Shoe* Court deducted the amount the plaintiff would have paid had it purchased the machines from the amount it paid under the lease to arrive at its overcharge damage amount. *See id.*

It further observed that the *Hanover Shoe* Court also approved a deduction reflecting the capital costs the plaintiff would have had to incur if it had purchased the machinery instead of leasing it. *Id.* (citing *Hanover Shoe*, 392 U.S. at 503–04, 88 S.Ct. 2224). This deduction would more accurately reflect the "but-for" purchase price of the machinery. *See id.* "Placing plaintiff in the position it would have been, absent the antitrust violation, ... required deducting from gross damages the amounts plaintiff *would have expended* if defendant had been willing to sell the machinery to plaintiff." *Id.* (emphasis added). The court concluded that "[t]his netting rule reflects the more general requirement that an antitrust plaintiff recover only

for 'antitrust injury' which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). Nowhere does the court in *Los Angeles Memorial Coliseum* advance the "no injury" argument Defendants' assert here. Accordingly, their reliance on this decision is misplaced.

Defendants' reliance on the Seventh Circuit Court of Appeals' decision in *Fishman v. Estate of Wirtz,* 807 F.2d 520 (7th Cir.1986), is similarly misplaced. In *Fishman,* the court found that the defendants' refusal to lease a sports stadium violated the antitrust laws because it "effectively cut off all competition for the acquisition" of the Chicago Bulls basketball franchise "and injured [the] plaintiffs as a result." *Id.* at 533. After addressing liability issues, the court turned its attention to issues concerning the calculation of damages. It agreed with the lower court's determination that the plaintiff "should receive as damages its lost financial gain", *id.* at 548, but disagreed with the methodology used to calculate those damages. The full passage Defendants rely on is as follows:

> We agree with both the defendants and the district court that, under facts like the ones in this case, antitrust damages may be offset by a figure that accounts for the fact that the plaintiffs actually had use of money that, but for the violation, would have been tied up in the lost business opportunity. This figure can be labeled the "plaintiffs' opportunity cost" in the context of this case. *Under the unique facts here,* we think this "plaintiffs' opportunity cost" is, for all practical purposes, *equivalent to mitigation,* and we agree that the tort rules regarding *mitigation of damages* can have their place in the law of antitrust. However, we disagree with the district court's method of computing opportunity cost.

*Id.* at 556–57 (emphasis added). They also rely on that portion of the decision where the Court rejects the "plaintiffs' contention that the opportunity cost should be zero." *Id.* at 557. Technically, it found the plaintiffs' position to be correct, but noted that "the district court imposed a duty to mitigate damages upon [the plaintiffs]' organizers and would-be shareholders." *Id.* It then observed that:

> In this connection, *we have in this case a peculiar fact-pattern:* the corporate plaintiff was not funded and has never been more than an empty shell. It is clear that the district court considered it inequitable to conclude this case with a measure of damages that would make the potential investors better off than if [the plaintiff] had actually owned and operated the Bulls for ten years. The [plaintiff corporation] organizers were able to keep, as a result of the antitrust violation, what would have been their equity contributions to [the plaintiff corporation]. Presumably, they invested, or could have invested, this money in some other way and received a return on it between 1972 and 1982. Accordingly, the district court "pierced" the corporate veil at least so far as to account for the "passive" retention by the [plaintiff corporation] investors of their contribution over ten years. *In view of the very unusual facts presented here,* we see nothing wrong with this exercise of the district court's discretion. As a matter of equity, on these facts there is no good reason to give a shell corporation advantages unavailable to one that was fully funded and operational.

*Id.* at 557–58 (emphasis added). Thus, the court agreed with the district court "that the plaintiffs' opportunity cost should be deducted from the damage award". *Id.* at 558. It did not agree, however, with the way the amount was calculated; finding that it "substantially overstated the amount of damages." *Id.* It observed that "[t]he principle of mitigation of damages, which as we have noted is *in this case only* opportunity cost by another name, requires a plaintiff to use his best efforts to minimize the damages caused by a defendant's wrongful conduct." *Id.* (emphasis added).

There is no discussion in *Fishman* remotely similar to Defendants' "no injury" argument. As with the other cases Defendants rely upon, the focus of the quoted analysis is

on damages; not the fact of injury. Moreover, the unique facts of *Fishman* are vastly different from those presented here.

The decision in *Burlington Indus. v. Milliken & Co.*, 690 F.2d 380, 383–86 (4th Cir. 1982), fails to advance Defendants' "no injury" argument as well. This decision considers damage issues only. There is no discussion of the lower court's prior determinations in the bifurcated liability phase where the fact of damage "was conclusively established". *Id.* at 384, n. 2. The fact of injury and liability resulted from a 1964 settlement agreement of certain patent litigation which was found to have the effect of stabilizing and maintaining the royalties charged by the conspiring defendants. *See id.* at 383. The only issues on appeal were the district court's decisions on damages. *See id.*

The *Burlington* court began by observing that the appeal "presents no dispute about the governing principle for the measurement of damages in a price-fixing case. Plaintiffs are entitled to recover the overcharge stemming from the illegal combination—i.e., the difference between the prices actually paid and the prices that would have been paid absent the conspiracy." *Id.* at 385 (citing *Hanover Shoe*). It then determined that the district court erred when it failed to determine the "but-for" price and simply used the actual royalties paid as the overcharge damage amount. Specifically, it held that "the district court erred in using the actual royalties paid as the measure of damages without considering whether royalties or some other compensation would have been payable absent the illegal conspiracy." *Id.* at 386. The court vacated the damage award and remanded the case for a "thorough factual inquiry into the difference, if any, between the overall price which [plaintiffs] were required to pay in the context of the royalty-maintenance conspiracy and the overall price they would have paid in an untainted market." *Id.* Recognizing that "antitrust damages can only be approximated" and that "antitrust coconspirators should be prevented from unfairly exploiting the complexity of factual issues occasioned by their unlawful conduct," the court concluded by observing that "defendants must be afforded the opportunity to prove that the actual royalties paid do not in fact equal the overcharge which is the true measure of plaintiffs' damages." *Id.* This analysis does not further Defendants' "no injury" argument.

Defendants' reliance on *Local Beauty Supply, Inc. v. Lamaur, Inc.*, 787 F.2d 1197, 1199–1203 (7th Cir.1986), is also misplaced. This case refutes rather than supports Defendants' position. In *Local Beauty*, the court held that the plaintiff, a terminated distributor of beauty products, lacked standing to bring an antitrust action for lost profits against the defendant manufacturer of beauty supplies "under the antitrust injury test set forth in *Brunswick v. Pueblo Bowl-O–Mat*, 429 U.S. 477, 97 S.Ct. 690 (1977)". The court observed that "[b]ecause [the plaintiff]'s interests are disserved by enhanced competition (it loses its discounting market), its injury is not the type the antitrust laws were intended to prevent." *Id.* at 1203. The court further observed that "*damages based on profits* made by a plaintiff because of the existence of an antitrust violation *are not recoverable.*" *Id.* (emphasis added) (citing *W. Goebel Porzellanfabrik v. Action Indus.*, 589 F.Supp. 763 (S.D.N.Y. 1984)). It held that "lost profits from the inability to continue to take advantage of inflated prices due to antitrust conduct are not representative of antitrust injuries recoverable under § 4 of the Clayton Act." *Id.* Plaintiffs here are not seeking damages for lost profits from their inability to continue to take advantage of inflated prices due to Defendants' antitrust conduct. Rather, they seek damages for the inflated prices they were forced to pay due to Defendants' antitrust conduct. Contrary to Defendants' arguments here, Plaintiffs' overcharge measure of damages isolates and compensates Plaintiffs for the injury they claim they suffered as a result of Defendants' antitrust conduct. *Accord Sports Racing Serv.*, 131 F.3d at 884–85 (observing that "*Hanover Shoe* precludes the argument that [the plaintiff] did not suffer cognizable antitrust injury merely because it passed overcharges on to its customers or otherwise was shielded from competition by the defendants' anticompetitive behavior.... As a direct purchaser, [the plaintiff] may sue for and recover the full

amount of the illegal overcharge.") (internal quotes and citations omitted).

In sum, Defendants confuse and conflate the injury and damage elements of Plaintiffs' case, misapply the holdings of the cases they rely upon, and attempt to resurrect *Brunswick* antitrust injury issues already decided by this Court in Plaintiffs' favor.[11] Defendants also misconstrue the overcharge measure of damages.

Defendants' net-individual-harm arguments attempt to impose an exactness on a direct purchaser's overcharge damage award that the courts do not require. As observed in an article co-authored by Defendants' expert Dr. Blair, the individual net-harm standard Defendants advocate here raises concerns for antitrust policy. As a result of those concerns, the Supreme Court altered the definition of harm for direct purchasers seeking overcharge damages and accepted the imprecision present in the gross overcharge measure of damages. *See Speculative Damages,* 70 Wash. L.Rev. at 433–34. The authors explained that:

> [i]n some cases the standard can raise so many problems of proof that the direct costs of proof and the risk of error become unacceptably large. In such instances, rigid adherence to the net-harm standard would require either denying recovery entirely or accepting an arbitrary damage award. Neither result would be consistent with antitrust policy. Thus, in certain cases, the courts have altered the definition of harm or who may sue. Overcharge damages, for example, were recognized by the Supreme Court primarily because of the difficulty of proving lost profits in price-fixing cases. Rather than require the complex netting associated with net profits, and thus practically deny recovery, the Court permitted plaintiffs to prove damages by showing a price enhancement.

*Id.* at 433–34 (citing *Chattanooga Foundry,* 203 U.S. at 396, 27 S.Ct. 65). The authors further observed that in *Illinois Brick,* the Supreme Court "assigned the full right to recover to the direct purchasers, who are not required to net out the amount of the overcharge that they passed on.... The standard of individual net harm yields to a standard of net social harm in order to accommodate the limitations of the legal system." *Id.* at 434.

In another article co-authored by Dr. Blair, it is observed that the Supreme Court in *Illinois Brick* feared that "under a pass-on system, each plaintiff would incur greater costs in proving damages and the net recovery for direct and indirect purchasers would decline" and that this "would 'seriously impair this important weapon of antitrust enforcement.' The Court recognized that rejection of the pass-on theory would mean that indirect victims of anticompetitive acts would go uncompensated. It also noted the likelihood that some direct purchasers would decline to bring an action against suppliers to avoid a disruption of their relationship with those suppliers. Still, in balancing the costs and benefits of permitting use of pass-on arguments, the Court found greater deterrence to be a more important goal than more accurate compensating." Roger D. Blair and Jeffrey L. Harrison, *Reexamining the Role of Illinois Brick in Modern Antitrust Standing Analysis,* 68 Geo. Wash. L.Rev. 1, 10–11 (Dec.1999). The authors further observed that the *Illinois Brick* "decision accepts in a very broad sense the imprecision of the gross overcharge measure of damages. It is imprecise not simply because some portion of the overcharge is passed on, but because the overcharge always has been regarded as a measure of the defendant's gain as opposed to the plaintiff's loss (or damage)." *Id.* at 11. *Illinois Brick* "does not adopt actual harm as the measure of damages, but adopts a surrogate—the full overcharge." *Id.* at 17. This Court agrees with the above observations.

It likewise agrees with Plaintiffs' position that the Supreme Court's decisions in *Chattanooga Foundry, Hanover Shoe,* and *Illinois Brick* refute Defendants' argument that Plaintiffs must net out the profits they may have lost after generic entry from their overcharge damage estimate to ascertain whether they suffered an injury in the first instance.

---

**11.** This Court has previously determined that Plaintiffs have alleged facts showing that they suffered an antitrust injury as defined in *Bruns-* *wick,* 429 U.S. at 489, 97 S.Ct. 690. *See* Order No. 12, Mem. Op. & Order Denying Defendants' Motions to Dismiss at 54–79.

Defendants argue that the by-pass phenomenon creates "winners" and "losers" in the but-for world because some class members would have been "better off" and others would be "worse off" if Andrx had entered the market earlier with its generic version of Cardizem CD. A similar argument was recently rejected by the United States District Court for the Eastern District of New York in a multi-district antitrust case:

> [D]efendants contend that [plaintiffs' expert]'s theory fails to account for what they predict would be a decline in the volume of off-line debit transactions in the "but-for," untied world with lower off-line debt interchange fees. That decline, considered in conjunction with defendants' assertion that some merchants garner incremental sales from accepting the cards, would create "winners" and "losers" and render class-wide assessment of injury inappropriate. This argument is immaterial when an antitrust plaintiff proceeds on an "overcharge theory" of damages.

*In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. at 85 (citing *New York v. Hendrickson Bros.*, 840 F.2d 1065, 1079 (2nd Cir.1988)). The same reasoning and result apply here.

Defendants' core concern here is that, without inclusion of its offsetting benefits arguments, the overcharge damage theory may result in a windfall to Plaintiffs. The courts have rejected similar concerns, recognizing that this risk "inheres in *Hanover Shoe*." *In re Airline Ticket Comm'n Antitrust Litig.*, 918 F.Supp. 283, 287 (D.Minn. 1996). As observed by the Ninth Circuit Court of Appeals:

> Allowing [the plaintiff] to sue for the full overcharge ... creates the possibility that [the plaintiff] might recover an amount, trebled, that exceeds its actual damages .... But this is no more than was approved in *Hanover Shoe,* where the plaintiff was allowed to recover for its "full" damages even though it "mitigated" its damages by passing part of the excessive costs to its customers. *Hanover Shoe* teaches that in such situations there is nothing wrong with the plaintiff winning a windfall gain....

*Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323, 327 (9th Cir.1980).

This does not mean that Plaintiffs may ignore the effect of the Andrx/Anda by-pass phenomenon on some wholesaler class members. Plaintiffs' expert testified at the February 8, 2001 hearing that well-established methodologies are available to calculate, with reasonable accuracy, an overcharge damage estimate that considers the by-pass phenomenon Defendants highlight. The damage estimate will do so by considering overcharges only for the quantity of generics that were actually substituted for Cardizem CD purchases after generic entry. The by-pass phenomenon will thus be reflected in the reduced quantity of generic substitutions by some wholesaler class members, and the overcharge damage estimate will not overstate the extent of Plaintiffs' damages.

In sum, Defendants' by-pass and offsetting benefits arguments relate to the quantum of damages; not the fact of injury. They do not alter this Court's conclusion that Plaintiffs have met their burden by showing that generalized evidence exists which proves or disproves the injury element of their antitrust claim on a simultaneous, class-wide basis. *See In re Potash Antitrust Litig.*, 159 F.R.D. at 693. "Common proof of impact is possible without common damage amounts." *Id.* at 694.

**(d) Variations in the Net Price Paid and Volumes Purchased Relate to Quantum of Damages; Not Fact of Injury**

■ Defendants next raise a more familiar argument. They contend that individual issues will predominate as to injury because the variety in prices paid and volumes purchased by Plaintiffs make it impossible to determine whether and to what extent Plaintiffs were injured without first examining (1) each class member's individual circumstances; and (2) the difference in market conditions in the "but-for" and actual worlds that may affect the volumes purchased or prices paid by each class member. Defendants' argument can be reduced to the following syllogism: if the net price each class member would have paid for its substituted generic purchases in the but-for world is

equal to or greater than the net price paid for its Cardizem CD purchases, then there is no injury in fact. Defendants' argument is not unique.

The heart of defendants' argument is that the individual questions of fact and law predominate over the general questions of law and fact because the price paid by each [class member] was determined through an elaborate system of individualized negotiations, contract and rebates. To determine any classwide impact, argue the defendants, you must first prove the impact, if any, on each of the class members. Because pricing in the industry is allegedly so individualized, the plaintiffs will be unable to show any consistent classwide relationship between the acts of the defendants and the prices paid by class members. Or at the very least, argue the defendants, proving such impact will require infinite mini-trials concerning the price actually paid by each class member.

*In re Commercial Tissue Prods.*, 183 F.R.D. 589, 595 (N.D.Fla.1998).

The courts have rejected similar arguments, despite differences in prices paid by class members, where the plaintiffs show that the "minimum baseline for beginning negotiations, or the range of prices which resulted from negotiations, was artificially raised (or slowed in its descent) by the collusive actions of the defendants." *Id.* (citing *In re Catfish Antitrust Litig.*, 826 F.Supp. 1019 (N.D.Miss.1993); *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 689 (N.D.Ga.1991); and *Hedges Enter. v. Continental Group, Inc.*, 81 F.R.D. 461, 475 (E.D.Pa.1979)). *See also In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 486 (W.D.Pa.1999) (observing that "even though some plaintiffs negotiated prices, if plaintiffs can establish that the base price from which these negotiations occurred was inflated, this would establish at least the fact of damage, even if the extent of the damage by each plaintiff varied."). Plaintiffs make the requisite showing here.

Plaintiffs intend to establish class-wide impact by introducing evidence showing that (1) both HMRI and Andrx have a common, standardized structure for Cardizem CD and Cartia XT prices charged to direct purchasers; and (2) the baseline prices were artificially inflated as a result of Defendants' antitrust conduct. Plaintiffs' expert Dr. Schondelmeyer concludes that, although direct purchasers may sometimes be charged different prices, Defendants have well-defined price structures set according to fixed criteria enumerated in company pricing manuals and guidelines. Moreover, while certain customers might use purchasing leverage to negotiate prices, they do so only within the context of the company's formal pricing structure. Furthermore, Defendants have a fairly standardized level of discounting. When discounts and rebates are given, they are specified as a percentage of each company's published price or wholesale acquisition price ("WAC"). The WAC price is the price the Defendants put on the invoice when it ships the product to the wholesaler. Discounts or rebates are taken off the WAC price and are done so according to established criteria. They are not individually negotiated. Price negotiations, to the extent they occur at all, occur within a structured and predictable framework. *See* Schondelmeyer 11/8/00 Rebuttal Report at ¶¶ 32–45. *See also* Plfs. Ex. E, F (consisting of two November 2000 letters from HMRI's counsel concerning HMRI's prices to direct purchasers and stating that "list prices do not vary by wholesaler customer"; "[w]holesalers and warehousing retail chains that purchase directly from HMRI are charged list price"; and "HMRI extends no discounts or rebates to direct purchaser wholesalers or warehousing retail chains, other than the 2% discount for payment within 30 days"), and G (copy of Andrx's pricing matrix showing four categories for direct purchasers and stating that these customers "pay WAC invoice price" and receive a rebate according to their category number) submitted at the 2/8/01 class certification hearing.

Using this common evidence, Plaintiffs assert, they will be able to prove that all class members suffered at least some injury as a result of Defendants' illegal conduct. Accordingly, variations in the net prices class members paid for their purchases of Cardizem CD and/or its generic bioequivalents are

relevant to proof of individual damage amounts; not the fact of injury. Likewise, differences in the quantity of their purchases are relevant to the quantum of damages; not the fact of injury.

In *In re NASDAQ Market–Makers Antitrust Litig.*, the court certified a class based on the plaintiffs' proffer of common evidence that the defendants' conspiracy had inflated the base from which price negotiations, if any, had occurred. The court observed that "[n]either a variety of prices nor negotiated prices is an impediment to class certification *if it appears that plaintiffs may be able to prove at trial that ... the price range was affected generally.*" 169 F.R.D. at 523 (emphasis added). Rejecting the defendants' argument that class-wide impact could not be shown, it quoted with approval the holding in *Hedges Enterprises v. Continental Group, Inc.*, 81 F.R.D. 461, 475 (E.D.Pa.1979):

> The proof necessary to demonstrate that the defendants conspired to maintain an inflated "base" from which all pricing negotiations began and that this "base" price was higher than the "base" price which would have been established by competitive conditions would be common to all members of the class. Proof of a conspiracy to establish a "base" price would establish at least the fact of damage, even if the extent of the actual damages suffered by the plaintiffs would vary .... [T]he proof with respect to the "base" price from which these negotiations began, or the structure of the conspiracy to affect individual negotiations, would be common to the class. Accordingly ... the fact of damage is predominantly, if not entirely, a common question.

*Id.* at 523. The same reasoning and result apply here. *See also In re Commercial Tissue Prods.*, 183 F.R.D. at 594–95; *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 383 (S.D.N.Y.1996) (observing that "[t]he theory that underlies these decisions is, of course, that the negotiated transaction prices would have been lower if the starting point for negotiations had been list prices set in a competitive market. Hence, if a plaintiff proves that the alleged conspiracy resulted in artificially inflated list prices, a jury could reasonably conclude that each purchaser who negotiated an individual price suffered some injury."). The decisions in *Am. Custom Homes, Inc. v. Detroit Lumberman's Ass'n*, 91 F.R.D. 548 (E.D.Mich.1981) and *Dry Cleaning & Laundry Inst. of Detroit, Inc. v. Flom's Corp.*, No. 91–CV–76072–DT, 1993 WL 527928 (E.D.Mich. Oct. 19, 1993) do not discuss the inflated base price argument Plaintiffs advance here. Accordingly, this Court finds them unpersuasive. *Accord In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. at 383, n. 8; *In re Plastic Cutlery Antitrust Litig.*, No. CIV. A. 96–CV–728, 1998 WL 135703, *8 (E.D.Pa. March 20, 1998).

The fact that Defendants' expert disagrees with Plaintiffs' expert's analysis and conclusions concerning common impact is neither surprising nor relevant at this stage of the litigation. *See In re Catfish Antitrust Litig.*, 826 F.Supp. at 1042 (observing that "[w]hether or not plaintiffs' expert is correct in his assessment of common impact/injury is for the trier of fact to decide, at the proper time."). At the class certification stage, the Court, "without trenching on the merits," must "consider only whether plaintiffs have made a threshold showing that what proof they will offer will be sufficiently generalized in nature that ... the class action will provide a tremendous savings of time and effort." *In re Potash Antitrust Litig.*, 159 F.R.D. at 697 (internal quotes and citations omitted).

"[A]ccording to Plaintiffs, the predominant question for all class members is whether, as a result of Defendants' conspiracy, the price they paid was artificially high because competition was removed from the market." *Id.* at 695. Relying on evidence that is common to the class and not unique to each class member, Plaintiffs assert that they can show this to be true and thus show class-wide impact. *See Sterling*, 855 F.2d at 1196–97. The fact that there may be some individualized questions pertaining to impact will not defeat class certification. As the United States District Court for the Southern District of New York recently observed:

> The Court cannot exclude the possibility that there will be some individualized ques-

tions pertaining to impact. It perhaps even is likely that the prices paid by some class members will have to be compared to a construct of the prices that would have prevailed absent the alleged conspiracy in order to determine whether they in fact were injured by it. But the Court is persuaded, at least on the present record, that the impact question is quite predominantly a common question.

*In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 167 (S.D.N.Y.2000). Defendants' arguments to the contrary are not convincing. This Court "is satisfied that this case is not so dissimilar from the litany of antitrust price-fixing cases which have rejected claims that product and market diversity prevented a showing of common impact." *In re Potash Antitrust Litig.*, 159 F.R.D. at 697.

### (e) Questions Regarding Substitution Behavior Do Not Preclude Class Certification

Defendants also argue that individual analysis is necessary to determine whether each class member would have substituted some of their Cardizem CD purchases with Andrx's generic alternative to Cardizem CD in the "but-for" world. A failure to do so, Defendants assert, means they cannot show that they in fact suffered an injury as a result of the HMRI/Andrx Agreement. Defendants' arguments do not withstand scrutiny.

As currently defined, each class member either substituted at least some purchases of Cardizem CD with that of a generic alternative after its entry on the market or received an increased discount on the Cardizem CD purchases they made after generic entry.

Evidence that all or virtually all class members substituted a lower-priced generic for some of their Cardizem CD purchases after generics became available gives rise to the inference that they would have similarly done so in the but-for world.[12] Likewise, evidence that other class members obtained increased discounts on their Cardizem CD purchases after generic entry likewise gives rise to the inference that increased discounts would have been obtained in the but-for world.

Defendants' arguments that some class members may not have purchased Andrx's generic version of Cardizem CD in the but-for world also fails to recognize Plaintiffs' claim that the HMRI/Andrx Agreement harmed them by delaying the entry of other generic alternatives as well. Plaintiffs present common proof that the entry of second and third generics on the market increase price competition and the generic substitution rate. Thus, evidence that Plaintiffs purchased these other generic alternatives once they entered the market, gives rise to the inference that they would have similarly done so in the but-for world.

Finally, Defendants' speculation that reasons other than the HMRI/Andrx Agreement may have caused some class members to forego substitution of lower-priced generic alternatives for some of their Cardizem CD purchases raise merit-based questions that are not considered at the class certification stage of litigation.[13] *See Eisen,* 417 U.S. at 177, 94 S.Ct. 2140; *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. at 684. Even if Plaintiffs could not show injury-in-

---

**12.** Defendants miss this point when they argue Plaintiffs must prove all their generic purchases were direct as opposed to indirect. Plaintiffs alleged injury here is that they paid an artificially inflated price for their Cardizem CD purchases because Defendants' illegal Agreement removed competition from the market. Plaintiffs further their claim that they would have substituted a more competitively priced generic alternative for some of their Cardizem CD purchases in the but-for world by showing they purchased a more competitively priced generic alternative for Cardizem CD after generics entered the market.

**13.** Plaintiffs assert there is no factual basis for Defendants' expert Dr. Blair's speculation that the existence of HMRI's patent suit against

Andrx in 1998 would have changed any class member's purchasing decisions. They point to an article, co-authored by Defendants' expert Dr. Blair, concluding that most purchasers are not even aware of the fact that they have exposure in a patent case. *See* Blair & Cotter, *An Economic Analysis of Seller and User·Liability in Intellectual Property Law,* 68 Univ. Cincinnati Law Review 1, 1–5 (Fall 1999). They also argue that Defendants' position is further refuted by the fact that Defendant Andrx has not shown any apparent effect on its generic sales although it faced another patent infringement suit after it came to market with its generic version of Cardizem CD. *See* Schondelmeyer 11/8/00 Rebuttal Report at ¶¶ 80–81.

fact as to a few class members, this would not be fatal. The courts have routinely observed that the inability to show injury as to a few does not defeat class certification where the plaintiffs can show widespread injury to the class. *See In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. at 523 (observing that "[t]he fact that a defendant may be able to defeat the showing of causation as to a few individual class members does not transform the common question into a multitude of individual ones; plaintiffs satisfy their burden of showing causation as to each by showing [generalized damage] as to all."). *Accord In re Auction Houses Antitrust Litig.*, 193 F.R.D. at 166; *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 347 (E.D.Pa.1976). As the court clarified in *In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603 (N.D.Ga.1997):

> At the class certification stage, the Court examines evidence as to how the class proponents intend to prevail at trial, not whether the facts adduced by the class proponents are susceptible to challenges by class opponents.... The difference can be summarized as follows: at the class certification stage, Plaintiffs must show that antitrust impact can be proven with common evidence on a classwide basis; Plaintiffs need not show antitrust impact in fact occurred on a classwide basis.

178 F.R.D. at 618.

This Court finds that Plaintiffs have met their burden by showing that impact is susceptible to class-wide proof. Plaintiffs must also show "that the computation of damages is susceptible to common proof." *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. at 692. The Court now evaluates whether Plaintiffs have satisfied this burden as well.

### b. Damages Are Susceptible to Class–Wide Proof

### (i) Plaintiffs' Burden at Class Certification

██ "Antitrust plaintiffs have a limited burden with respect to showing that individual damages issues do not predominate. Plaintiffs do not need to supply a precise damage formula at the certification stage of an antitrust action. Instead, in assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods are so insubstantial as to amount to no method at all." *In re Potash Antitrust Litig.*, 159 F.R.D. at 697. "This relaxed standard flows from the equitable notion that the wrongdoer should not be able to profit by insistence on an unattainable standard of proof." *Id.* (citing *In re Catfish Antitrust Litig.*, 826 F.Supp. at 1042–43). "Obviously, certain knowledge of what plaintiff's position would have been in the absence of defendant's antitrust violation is never known." *In re Catfish Antitrust Litig.*, 826 F.Supp. at 1042 (citing *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566–67, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981)). "Moreover, the fact that the damages calculation may involve individualized analysis is not by itself sufficient to preclude certification when liability can be determined on a class-wide basis." *In re Potash Antitrust Litig.*, 159 F.R.D. at 697.

### (ii) Plaintiffs' Burden Is Satisfied; Plaintiffs Have Proffered Reasonable Damage Methodologies That Are Common to the Class

Defendants acknowledge that the methods Plaintiffs propose to use to estimate damages; i.e., the "yardstick" and "before and after" methods, are judicially recognized and commonly accepted. *See* Defendants' Brief at 27–28; Blair Report at ¶ 9. *See also In re NASDAQ*, 169 F.R.D. at 521. Nonetheless, they assert that Plaintiffs' methodology and its damage calculations are too imprecise for class certification. Specifically, Defendants complain, the proffered methodology fails to adequately account for important individual differences in the actual and but-for worlds that affect the prices each class member would have paid and the quantities each would have purchased; e.g., mergers and acquisitions, geographical differences, HMO activity, participation in buying groups, discounts, rebates, chargebacks, allowances, etc. Defendants demand too much. At the class certification stage, it is not necessary to identify specific benchmarks or methodology to ascertain the amount of damages. "It is

sufficient to note at this stage that there are methodologies available, and that Rule 23(c)(1) and (d) allow ample flexibility" to deal with the individual damages issues that may develop.[14] *See In re NASDAQ*, 169 F.R.D. at 522. "The Court need not decide at this juncture what approach is best suited to the particularities of this case." *Id.*

Plaintiffs have proffered several reasonable damage methodologies for measuring class-wide damages on an aggregate basis and for calculating damages for individual class members. The methodologies are common to the class, "and the validity of each will be adjudicated at trial based upon economic theory, data sources, and statistical techniques that are entirely common to the class." *In re NASDAQ*, 169 F.R.D. at 521.

Plaintiffs allege that the HMRI/Andrx Agreement prevented generic versions of Cardizem CD from becoming available as quickly as they otherwise would and, as a result, they suffered injuries. Those injuries flow from (1) Plaintiffs' inability to substitute lower priced generics for at least some of their Cardizem CD purchases; and (2) from certain favored purchaser class members' inability to obtain increased discounts on their Cardizem CD purchases that would have been available once generics entered the market.

Plaintiffs contend that all or virtually all of the class fits under the first category. To measure their damages, Plaintiffs' experts propose methodology for determining (1) the generic penetration (or substitution) rate; and (2) the price of the generic drug in relation to the price of Cardizem CD over time.[15] The Cardizem CD prices are available directly from Defendants' records, and the generic prices and substitution rates, Plaintiffs contend, can be estimated using common proof, including: (1) analysis of other brand name drugs' experience with generic competition ("yardstick approach"), and (2) data demonstrating what actually happened when Andrx, and then others, began selling generic Cardizem CD ("before and after approach"). Plaintiffs' expert concludes that either approach or a combination of the two would be appropriate to estimate damages here. *See* Schondelmeyer 11/8/00 Rebuttal Report at ¶ 64.

Plaintiffs' expert Dr. Solow opines that damages for the second category of "favored purchasers" can be calculated by determining (1) how much Cardizem CD they would have continued to buy; and (b) the amount of the increased discount that would be available for Cardizem CD purchases after generic entry. He proposes use of a before-and-after method that considers actual data regarding the volume of Cardizem CD purchases and price discounts after generic entry. *See* Solow 6/14/00 Initial Report at ¶¶ 25, 26.

Defendants focus their challenges on the methodology Plaintiffs' experts proffer for class members falling within the first category. Accordingly, this Court focuses on that methodology as well.

### (a) A Yardstick is Readily Available

Despite Defendants' and their expert's assertions to the contrary, a yardstick is readily available to serve Plaintiffs' purposes here. Dr. Schondelmeyer states in his Rebuttal

---

**14.** Fed.R.Civ.P. 23(c)(1) provides that an order under Rule 23 "may be conditional, and may be altered or amended before the decision on the merits."

Fed.R.Civ.P. 23(d) provides that: "In the conduct of actions to which this rule applies, the court may make appropriate orders: (1) determining the course of proceedings or prescribing measures to prevent undue repetition or complication in the presentation of evidence or argument; ...."

**15.** Plaintiffs' expert Dr. Schondelmeyer opines that damages to the class can be calculated by determining the expected generic penetration rate (% of all units that would have been purchased as a generic product) for purchasers at a certain point in time, multiplied by the total units of the brand product that the purchasers actually purchased in that time period; yielding the number of generic units that would have been purchased. This figure would then be multiplied by the expected price differential between the generic and the brand to determine the dollar amount of damages. He expresses the formula as follows: Damages = (Generic unit penetration rate) × (brand units purchased) × (price differential). The same economic formula and methodology, he opines, can be used, or modified, in order to reliably establish any direct purchaser's individual damages. *See* Schondelmeyer 11/8/00 Rebuttal Report at ¶ 93.

Report that there are standard methods for generating and using appropriate yardsticks based on other brand-generic combinations. *See id.* at ¶ 66. Many pharmaceutical manufacturers with a brand name drug facing patent expirations will conduct such an analysis to estimate the impact of generic entry into the market place and to estimate their potential revenue given various scenarios with respect to price versus the brand and unit penetration. *See id.* at ¶ 68. He concludes that there are many choices for a feasible yardstick in this case:

> One could chose a single drug product as a "yardstick" for comparison to Cardizem CD as its AB-rated generic versions enter the market. Many such yardsticks were used by HMR personnel to plan for the financial and marketing future expected for Cardizem CD. Also, one could select an appropriate set of drug products that have gone off patent and enter the price and generic penetration data into a regression equation. The use of statistical regression would allow one to learn from the experience of a number of other drugs and to model the empirical findings from those drugs in a manner that matches the characteristics of the drug being evaluated, in this case Cardizem CD and its generic equivalents. The regression model approach allows for more flexibility to adjust for nearly all types of appropriate circumstances that may require special consideration.

*Id.* at ¶ 70.

Dr. Schondelmeyer opines that, given his extensive knowledge and experience studying the circumstances of nearly every generic drug to come on the market since the mid-1980's, as well as his vast experience using yardsticks to estimate the behavior of a brand name drug product facing generic competition, he will be able to devise a sufficiently comparable yardstick for this case. *See id.* at ¶ 66. Also, Dr. Schondelmeyer notes, actual market data exists here regarding what happened when Andrx entered the market in June of 1999 and when other generics subsequently entered the market in late December 1999 and early January 2000. This actual market data can serve to validate the reasonableness and effectiveness of any specific yardstick used in this case. *See id.* at ¶ 67, 71, 72.

**(b) Actual Data Exists and Can Be Used For the "Before and After" Method**

 As with the "yardstick" method, it is not disputed that the "before and after" method is a commonly used economic methodology. Rather, Defendants complain that Plaintiffs' experts have not sufficiently analyzed whether the time period before and after generic versions of Cardizem CD entered the market are sufficiently comparable to serve a useful purpose in this litigation. Defendants argue here for a level of perfection that is not required at this stage of the litigation. *See In re NASDAQ,* 169 F.R.D. at 522.

Dr. Schondelmeyer observes that he has at his disposal very detailed information on each and every sale of the relevant drugs at the manufacturer level because both state and federal law require such record keeping for periods of at least five to seven years. Drug firms also keep extensive databases detailing quantities sold, prices, discounts, rebates, and other forms of compensation. All class members should have similar records for their purchases. An additional source of data comes from the firm known as IMS America. *See id.* at ¶¶ 71, 72. Based on his analysis of the behavior of prescription drugs in the post-generic entry period, Dr. Schondelmeyer concludes that this data will be highly useful in determining the "but-for" world in this case. Data regarding what actually occurred when Andrx began marketing its product in June 1999 can be used as a basis for drawing conclusions about what would have occurred had Andrx come on the market in July of 1998. *See id.* at ¶ 74. He opines that use of Cardizem CD and its AB-rated generic equivalents in an "after" model to quantify the level of damages would have the strength of, among other things, including the same drug products and the same firms. The primary source of variation, he concludes, would be the few factors that may have changed over the short period of time at issue here. *See id.* at ¶ 75. He concludes that the differences Defendants highlight do

not render this method useless. *See id.* at ¶¶ 78–90.

Defendants argue that Plaintiffs' experts' inability to answer questions about the specifics of their proposed methodology render their opinion nothing more than unexplained assurances that they can compute damages on a class-wide basis. The courts have routinely rejected similar arguments. *See In re Domestic Air Transp. Antitrust Litig.,* 137 F.R.D. at 692–93 (citing *In re Wirebound Boxes Antitrust Litig.,* 128 F.R.D. 268, 1989–2 Trade Cas. (CCH) ¶ 68,818 at 62,284 (D.Minn.1989); *In re Corrugated Container Antitrust Litig.,* 556 F.Supp. 1117, 1154 (S.D.Tex.1982); *In re Plywood Antitrust Litig.,* 1979–1 Trade Cas. (CCH) ¶ 62,459 (E.D.La.1978), *aff'd,* 655 F.2d 627 (5th Cir. 1981)). "It is not necessary that plaintiffs show that [their expert]'s methods will work with certainty at this time. Rather, plaintiffs' burden is to present the Court with a likely method for determining class damages." *In re Domestic Air Transp. Antitrust Litig.,* 137 F.R.D. at 693. Plaintiffs have met that burden here. *See Lumco Indus. v. Jeld–Wen, Inc.,* 171 F.R.D. 168, 174 (E.D.Pa.1997) (observing that "[a]t this point, ... Plaintiffs are not required to come forward with more specific formulas for calculating damages.").

Despite their current criticism that the above methods are too unreliable to provide accurate results, Defendants have used these same methods. They have prepared numerous forecasts and models of the expected rate of generic penetration. *See* Schondelmeyer 11/8/00 Rebuttal Report at ¶¶ 68–70; Plfs. Appendix, Ex. J. Before entering into the September 1997 HMRI/Andrx Agreement, HMRI used a similar yardstick method to make its own projections of the expected generic penetration rate and generic price upon entry. HMRI documents indicate its conclusion that generic versions of Cardizem CD would have captured a significant percentage of the market at a significant discount off the brand name price and delayed generic entry would result in hundreds of millions of increased revenue to HMRI. *See* Schondelmeyer 6/14/00 Report at ¶¶ 48–49, 66; Schondelmeyer 11/8/00 Rebuttal Report

at ¶ 69. In March 1998, Andrx used a similar yardstick method to project the market share and revenues it would receive after generic entry. *See id.*

The HMRI/Andrx Agreement itself provides that Andrx would be paid $100 million per year to compensate it for the estimated lost profits flowing from its agreement to refrain from marketing its generic version of Cardizem CD. *See* Plfs. Appendix, Ex. B, HMRI/Andrx Agreement at ¶ 3(A). To ascertain this figure, Defendants likely had to use similar yardstick methods to predict the generic penetration rate had Andrx entered the market with its generic in July of 1998 and to predict the prices it would have charged. Defendants' expert Dr. Blair previously submitted a declaration in this matter opining that, based on Andrx's 1999 post-entry profits, the $100 million figure was a reasonable estimate of the profits Andrx would have earned if it had come to market in July 1998. *See* Blair Decl. at ¶ 8, n.5 submitted in support of Defendants' opposition to Plaintiffs' motion for partial summary judgment.

Moreover, despite Defendants' claims to the contrary, the use of an aggregate approach to measure class-wide damage is appropriate. As observed by a leading commentator on class actions: "[a]ggregate computation of class monetary relief is lawful and proper. Challenges that such aggregate proof affects substantive law and otherwise violates the defendant's due process or jury trial rights to contest each member's claim individually, will not withstand analysis." 2 *Newberg on Class Actions,* Chapter 10, § 10.05 (3d ed.1992). *See also In re NASDAQ,* 169 F.R.D. at 525 (observing that "aggregate judgements have been widely used in antitrust, securities and other class actions."). To the extent individual variations must be accounted for in Plaintiffs' damage analysis, the historical data of class members' actual prices and penetration rates, along with standard statistical techniques, can be used to estimate damages. Contrary to Defendants' attempt to portray the Cardizem CD/generic alternative market as highly complex and individualized, Plaintiffs' expert concludes that the market is in

fact highly structured with prices set according to pre-set criteria enumerated in company pricing manuals. *See* Schondelmeyer Rebuttal Report at ¶¶ 32–45; Schondelmeyer Dep. at 201–202, 214, 294.

The bulk of Defendants' arguments challenge the merits of Dr. Schondelmeyer's conclusions. The courts routinely reject such arguments, observing that they are improper at this stage of the litigation. "[T]he fact that the defendants' expert disagrees with the methodology and conclusions propounded by [plaintiff's expert] is not reason to deny class certification. Whether or not plaintiffs will be successful in persuading the jury … remains to be seen." *In re NASDAQ,* 169 F.R.D. at 522 (internal quotes and citation omitted). "It is particularly important at this point to focus on the task before the court in considering a motion for class certification. The court is not to consider the merits of the claim; …. Instead, the court is only to consider whether the type of proof offered by plaintiffs … will be of classwide character such that class action treatment of the case will be superior to myriad individual actions." *In re Commercial Tissue Prods. Antitrust Litig.,* 183 F.R.D. at 596. The relevant inquiry here is whether generalized evidence exists which will prove or disprove Plaintiffs' claims on a simultaneous, classwide basis. *See In re Potash Antitrust Litig.,* 159 F.R.D. at 693. That standard is met here.

For the above reasons, this Court finds that common questions predominate over individual ones in the proof of Plaintiffs' claimed injuries and damages. The Court now addresses Plaintiffs' final requirement for class certification: satisfaction of Rule 23(b)(3)'s superiority requirement.

### 2. Superiority

██ Fed.R.Civ.P. 23(b)(3) also requires the Court to find "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." [16] The superiority requirement is fulfilled here. Defendants contend that a class action is not a superior method here because the members of the proposed class are businesses, including some very large corporations with sizable individual claims, who are fully capable of bringing their own individual actions. The Court is not persuaded by Defendants' arguments.

First, "the presence of large claimants in a proposed antitrust class and the possibility that some of them might proceed on their own does not militate against class certification." *Paper Sys., Inc. v. Mitsubishi Corp.,* 193 F.R.D. 601, 605 (E.D.Wis.2000) (citing *In re Folding Carton Antitrust Litig.,* 75 F.R.D. 727, 732 (N.D.Ill.1977)). *See also Scholes v. Moore,* 150 F.R.D. 133, 138 (N.D.Ill.1993) (observing that "[a]lthough some class members … may have 'large' claims … this will not defeat class certification"); 4 *Newberg on Class Actions,* § 18.40 at 18–138 (3d ed.1992) (commenting that "[i]t is important to note that though the existence of small claims may be a strong factor in upholding a class, the class should not be denied merely because individual claims are large"). Contrary to Defendants' assertions, not all of the approximately 80 class members are large businesses with large claims. Rather, there is diversity both in the size of their businesses and in the size of their claims. *See* 2/8/01 Hrg. Tr. at 206, 235; Schondelmeyer 11/8/00 Rebuttal Report at ¶¶ 58–63 and Ex. F. "Given the complexities of antitrust litigation, it is not obvious that all members of the class could economically bring suits on their own." *Paper Sys.,* 193 F.R.D. at 605. Nor is it obvious that all members of the class would be willing to independently sue their suppliers. "[T]he companies involved may reasonably believe that given the size of the losses involved, even treble damages are not sufficient to outweigh the cost in good will of suing their suppliers." *Id.* These factors,

---

16. Factors to be considered include:
(A) the interest of members of the class in individually controlling the prosecution or defense of separate action;
(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
(C) the desirability or undesirability of concentrating litigation of the claims in the particular forum;
(D) the difficulties likely to be encountered in the management of a class action.
Fed.R.Civ.P. 23(b)(3).

along with the predominance of common questions, militate against a finding that there is a strong interest of members of the class in individually controlling the prosecution or defense of separate actions. The presence of two independent Sherman Act cases, consolidated here for pretrial proceedings, when weighed against all the factors discussed here, does not alter the Court's conclusion that a class action is the most efficient and fair method for resolving this controversy.

Second, proceeding with this consolidated multi-district litigation as a class action will achieve economies of both the litigants' and the Court's time, efforts and expense. "Repeatedly litigating the same issues in individual suits, if certification were denied, would consume may more judicial resources than addressing them at a single blow in these consolidated actions." *Id.* at 616.

Third, this Court foresees no insurmountable manageability problems in proceeding with this case as a class action. The Court anticipates that the proposed class will be more manageable than a great many other price-fixing cases that have been certified as classes. Defendants' manageability arguments assume that individual rather than common issues will predominate. As discussed above, this assumption is false. Defendants' argument that individual damage questions preclude class certification is likewise to no avail. "[I]f individual damage questions were a barrier to class certification, there would be little if any place for the class action device in the adjudication of antitrust claims." *In re NASDAQ*, 169 F.R.D. at 524 (internal quotes and citation omitted). Plaintiffs' contend that purchase data is readily available to ascertain individual damage amounts. *See* Schondelmeyer 6/14/00 Report at ¶¶ 35–50, 63, 68–69; Schondelmeyer 11/8/00 Rebuttal Report at ¶¶ 63, 68–69, 71–72, 73–103. Moreover, if complications in calculating damages appear evident, the Court has the option, under Rule 23(c)(1), to alter or amend its class certification order before a decision is rendered on the merits. *See* Fed.R.Civ.P. 23(c)(1). It also has the option of bifurcating the liability and damage phases of the litigation or appointing a spe-

cial master or magistrate judge to assist in calculating damages. *See Little Caesar Enter.*, 172 F.R.D. at 267. Accordingly, the Court finds that a class action is superior to other methods for fairly and efficiently adjudicating this controversy.

## IV. Conclusion

Finding that all of the requirements of Rules 23(a) and 23(b)(3) are satisfied, this Court **GRANTS** Plaintiffs' motion for class certification. This action shall be maintained as a class action on behalf of the class defined herein. This determination is conditional and may be altered or amended prior to the decision on the merits in light of any changes in the circumstances that make such action advisable. *See* Fed.R.Civ.P. 23(c)(1).